**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------X

STEPHANIE SANZ, BRYAN HARMIN, ANNYA
SANTANA, NYKYA LUCE, JESSICA WAFER, KATELYN
CANNING, STEPHANIE WALSH AND OSCAR ROJAS,
individually and on behalf of all other similarly situated
Plaintiffs,

v.

JOHNY UTAH 51 LLC, D/B/A JOHNNY UTAH'S, JOHN
SULLIVAN, THOMAS CASABONA, J.R. LOZADO, DOE
Corporations I through X, inclusive, and DOE Limited Liability
Companies I through X, inclusive,

Defendants.

------------------------------------------------------------------------X

14 CV 4380

**INDEX NO._____**

**CLASS ACTION COMPLAINT**

JUDGE FURMAN



Individual and Representative Plaintiffs Stephanie Sanz, Bryan Harmin, Annya Santana, Nykya Luce, Jessica Wafer, Katelyn Canning, Stephanie Walsh and Oscar Rojas (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, allege, upon personal knowledge as to themselves and upon information and belief as to other matters, against Defendants Johny Utah 51 LLC, d/b/a Johnny Utah's ("Johnny Utah's"), John Sullivan ("Sullivan"), Thomas Casabona ("Casabona"), and J.R. Lozado ("Lozado"), as follows:

## NATURE OF THE CLAIM

1.       This case addresses the pervasive sexual harassment and discriminatory practices and policies at Johnny Utah's, a western-themed restaurant and bar located in Rockefeller Center. Beneath the advertised "wild west party" atmosphere promoted by Defendant Johnny Utah's, and its owners and supervisors, is a hyper-sexualized work environment that increases the Defendants' profits by exploiting, degrading and humiliating its female employees.

2.      Female servers and bartenders are required to wear sexually provocative clothing, including cut-off denim shorts, cut-off shirts, cowboy boots, and excessive make-up, and are instructed by their superiors to look sexy and "available" to the male patrons.  Managers expect the female servers to flirt and "party" with their male customers.  Female employees are expected to encourage male customers to buy them shots of alcohol during their work shifts, to sit on male customers' laps, ride a mechanical bull with other female employees and male customers, dance on top of the bar in front of customers and pour shots of alcohol into customers' mouths.

3.      On a consistent and regular basis, Defendants urge the female employees to take off their shirts when they ride the mechanical bull and kiss other female employees when they ride the bull together. During beach theme parties held during the summer, the female servers must wear bikini tops and customers watch as the female servers splash around in plastic baby/toddler pools set up throughout Johnny Utah's.

4.      Certain female employees, called the "Daisy Dukes girls," are paid to walk around Rockefeller Center between 9:00 p.m. and 12:00 a.m., wearing cowboy boots, cut-off denim shorts and t-shirts, to solicit male customers to patronize Johnny Utah's.  The Daisy Dukes girls hand out promotional flyers to men on the street and if the customer comes to Johnny Utah's with the promotional flyer, the Daisy Duke girl whose initials are on the flyer receives $2.

5.      At all times, male employees at Johnny Utah's wear long sleeved shirts and jeans and are not required to drink shots of alcohol during their shifts with customers, ride the mechanical bull, dance on the bar, take their shirts off, kiss their co-workers, sit in their customers' laps, get wet in the baby/toddler pools or walk through the streets of Manhattan soliciting customers.

6.      As part of the wild west party atmosphere at Johnny Utah's, the female servers are subjected to pervasive and regular unwelcome sexual comments, propositions, and physical contact by male customers.  Female servers know that if they complain to management about the unwelcome sexual conduct that they will be penalized and told that they are "not fun" and do not know how to "throw a party." Defendants tell female servers to be "team players" and not complain about the sexual conduct because it is "part of their job."

7.      Female servers do not complain or report unwelcome physical contact by male customers to management because employees who do complain are systematically cut from working the favorable work shifts and lucrative private parties.  Managers frequently remind the female servers that they are expendable and tell them that "twenty (20) other women" are willing to take their job.

8.       By intentionally using the ramped up sexualization of its female employees to sell alcohol to the male patrons and requiring that their female employees submit to unwelcome sexual conduct, at all relevant times, the owners and managers of Johnny Utah's have knowingly engaged in the discriminatory policies and practices.

9.      At all relevant times, Johnny Utah's operates as a restaurant and bar, and is in the business of selling food and alcohol. Johnny Utah's is not in the business of selling adult male entertainment and the service employees are not dancers, entertainers or performers. There is no bona fide occupational qualification for female service employees to adhere to the systemic discriminatory policies that the Defendants impose upon them in order for the female employees to maintain their jobs at Johnny Utah's. Assumption of the risk is not a defense to sexual discrimination and pervasive hostile environment conditions in the workplace.

10.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, this case is commenced by Plaintiffs Stephanie Sanz, Annya Santana, Nykya Luce, Jessica Wafer, Katelyn Canning and Stephanie Walsh, on behalf of all former and current Johnny Utah's female servers, bartenders, hostesses and Daisy Dukes girls (collectively, the "female servers"), who worked at Johnny Utah's between June 11, 2011, through the resolution of this action, to remedy Defendants' violations of the New York State Human Rights Law under §290 *et. seq.,* and §296 as amended, (the "NYSHRL"), and the New York City Human Rights Law, Article 1, Section 8 of the New York City Administrative Code, § 8-101, *et. seq*., (the "NYCHRL") (the "Female Service Employee Class").

11.     In addition to the female servers' discrimination claims, all Johnny Utah's service employees, including the male bartenders, bussers, runners and bar backs, were regularly and systematically denied overtime wages, spread of hours pay, and proper distributions of the tip pool. Plaintiffs Stephanie Sanz, Bryan Harmin, Annya Santana, Nykya Luce, Jessica Wafer, Katelyn Canning, Stephanie Walsh and Oscar Rojas bring this action on behalf of themselves and other similarly situated current and former employees who elect to opt in to this action pursuant to the Fair Labor Standards Act, 29 U.S.C. §§201 *et. seq*. ("FLSA"), and specifically the collective action provision of 29 U.S.C. §216(b), who worked at Johnny Utah's between June 11, 2011, through the resolution of this action, to remedy Defendants' wage and hour violations of the FLSA (the "Collective Action Class").

12.     Plaintiffs further bring a cause of action pursuant to Rule 23, on behalf of themselves and other similarly situated current and former Johnny Utah's service employees, including the male bartenders, bussers, runners and bar backs, who worked at Johnny Utah's, between June 11, 2008, through resolution of this action, to remedy Defendants' wage and hour

violations of the New York Labor Law ("NYLL"), Article 6, §§190 *et seq*., Article 19, §§ 650 *et seq.*, and 12 New York Codes, Rules and Regulations ("NYCRR"), §§142-2.1 *et seq.* (the "NYLL Class").

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this controversy pursuant to 28 U.S.C. § l331 and 29 U.S.C. §216(b).

14.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367 because those claims are so closely related to Plaintiffs' claims that they form part of the same case or controversy.

15.     Venue is proper in the Southern District pursuant to 28 U.S.C. §1391 as the events and conduct giving rise to the claims occurred in this District.

## THE PARTIES

16.     Plaintiff Stephanie Sanz ("Sanz") is a former server at Johnny Utah's who resides in New York County, New York.  She worked as a server at Johnny Utah's from January 2012 through June 2014.  Sanz is a covered employee within the meaning of the FLSA and NYLL.

17.     Plaintiff Bryan Harmin ("Harmin") is a former bartender at Johnny Utah's who resides in New York County, New York. He worked as a bartender at Johnny Utah's from May 2012 through June 2013.  Harmin is a covered employee within the meaning of the FLSA and NYLL.

18.     Plaintiff Annya Santana ("Santana") is a former server at Johnny Utah's who resides in New York County, New York. She worked as a server at Johnny Utah's from October 2013 through June 2014.  Santana is a covered employee within the meaning of the FLSA and NYLL.

19.     Plaintiff Nykya Luce ("Luce") is a former hostess at Johnny Utah's who resides in New York County, New York.  She worked as a hostess at Johnny Utah's from February 2014 through June 2014.  Luce is a covered employee within the meaning of the FLSA and NYLL.

20.     Plaintiff Jessica Wafer ("Wafer") is a former Daisy Dukes girl at Johnny Utah's who resides in New York County, New York.  She worked as a Daisy Dukes girl at Johnny Utah's from August 2012 through November 2013.  Wafer is a covered employee within the meaning of the FLSA and NYLL.

21.     Plaintiff Stephanie Walsh ("Walsh") is a former Daisy Dukes girl at Johnny Utah's who resides in New York County, New York.  She worked as a Daisy Dukes girl at Johnny Utah's from May 2013 through June 2014.  Walsh is a covered employee within the meaning of the FLSA and NYLL.

22.     Plaintiff Katelyn Canning ("Canning") is a former Daisy Dukes girl and bartender at Johnny Utah's who resides in New York County, New York.  She worked as a Daisy Dukes girl and bartender at Johnny Utah's from January 2013 through November 2013. Canning is a covered employee within the meaning of the FLSA and NYLL.

23.     Plaintiff Oscar Rojas ("Rojas") is a former busser/runner and bar back at Johnny Utah's who resides in New York County, New York.  He worked as a busser/runner and bar back at Johnny Utah's from August 2013 through May 2014.  Rojas is a covered employee within the meaning of the FLSA and NYLL.

24.     Defendant Johny Utah 51 LLC, d/b/a Johnny Utah's ("Johnny Utah's") is a domestic limited liability company formed and existing under the laws of the State of New York, with its principal place of business located at 214 East 49th Street, New York, New York 10017. The restaurant Johnny Utah's is located at 25 West 51st Street, New York, New York 10019.

25.     Upon information and belief, Defendant John Sullivan ("Sullivan") is a resident of New York, New York, and was at all relevant times, an officer, member, shareholder and/or owner of Johnny Utah's.   Upon information and belief, Defendant Sullivan also owns and operates multiple bars and restaurants throughout Manhattan, including Calico Jack's, Cantina, Irish Exit, McFadden's Saloon, McFadden's 42, Savannah, Snitch, Sully's Restaurant, Tavern on Third and Turtle Bay.

26.      Upon information and belief, Defendant Sullivan also owns and operates East Coast Saloons, a restaurant and entertainment company with over 30 restaurant/bars nationwide.

27.     Upon information and belief, Defendant Thomas Casabona ("Casabona") is a resident of New York, New York, and is an agent, manager or supervisor of Johnny Utah's.

28.     Upon information and belief, Defendant J.R. Lozado ("Lozado") is a resident of New York, New York, and is an agent, manager or supervisor at Johnny Utah's.

29.     The true names and capacities, whether individual, corporate, associate or otherwise of Defendants named herein as DOE Corporations I through X, inclusive, and DOE Limited Liability Companies I through X, inclusive, are unknown to Plaintiffs who, therefore, sue said Defendants by such fictitious names and will seek leave to amend this Complaint to show their true names and capacities when they have been ascertained. Plaintiffs believe that each Defendant named as a DOE Corporation or DOE Limited Liability Companies, is responsible in some manner for the acts and/or omissions alleged herein.

30.     Upon information and belief, Defendant Sullivan is the owner, director or president of Defendants named herein as DOE Corporations I through X, inclusive, and DOE Limited Liability Companies I through X, inclusive. Upon information and belief, Defendants named herein as DOE Corporations I through X, inclusive, and DOE Limited Liability Companies I

through X, inclusive, are the parent companies that own Defendant Johnny Utah's.  Plaintiffs will request leave to amend the Complaint to insert the true names and capacities of the individuals or entities, when they have been ascertained, who are responsible for the ownership of Defendant Johnny Utah's.

31.     At all relevant times, Defendants Sullivan, Casabona and Lozado were the affiliates, agents, representatives or employees of Defendant Johnny Utah's, and each of them were acting within the course and scope of their agency, employment and/or concert of action and are vicariously liable, jointly and severally, for the actions or inactions, and or omissions of themselves and of other Defendants which proximately caused the damages to the Plaintiffs as alleged herein.

32.     Defendants Sullivan, Casabona and Lozado exercised control over the terms and conditions of Plaintiffs' employment and those of similarly situated employees, including the (1) control of day to day operations; (2) the power to hire and fire employees; (3) supervision and control of employee work schedules; (4) the rate and method of payment for employees and (5) the maintenance of employment records for Johnny Utah's.

33.     At all relevant times, Johnny Utah's, was and continues to be an "enterprise engaged in commerce" within the meaning of the FLSA.

34.     At all relevant times, Johnny Utah's annual gross volume of sales made or business done was not less than $500,000.00.

35.     At all relevant times, the work performed by Plaintiffs and similarly situated employees was directly essential to the business operated by Defendants.

## FACTUAL ALLEGATIONS

### Johnny Utah's: "Welcome To The Wild, Wild West"

36.     Located in Rockefeller Center at 25 West 51st Street, Johnny Utah's promotes the restaurant as an "urban cowboy experience" that is "home to New York City's original mechanical bull."  Johnny Utah's caters to a young male heterosexual crowd and promises that guests will have "the most over the top party in NYC and an experience they'll never forget!"

http://www.johnnyutahs.com

37.     The 6,000 square foot restaurant has three 15 foot projection screens, accommodates parties from 15-400 guests, and has multiple private party rooms.

38.     As described on its website:

> Our outrageous staff, incredible DJs and out of control party atmosphere makes Johnny Utah's the number 1 party destination in NYC.  Johnny Utah's has redefined the urban cowboy experience through our unique promotions and rowdy atmosphere. Cowgirls, Cowboys, and Rock Stars of all kinds are encouraged to come in and get wild!

http://www.johnnyutahs.com.

39.     As part of the "rowdy" and "over the top" party atmosphere, customers are served their food and alcohol by thin attractive women in their early 20s wearing cut-off shorts, tight jeans, tight cut-off shirts and cowboy boots.   When the atmosphere at Johnny Utah's starts to get "wild," customers watch as the female servers climb onto the bar and dance.   The female employees also climb on top of the bar and pour shots of alcohol directly from the bottle into their customers' mouths.   Johnny Utah's is so "outrageous" that the female servers are encouraged by their managers to drink shots of alcohol with their customers, sit on their customer's laps and ride the mechanical bull with one another and older male customers.

40.     Johnny Utah's has numerous promotional events to attract customers. In the summer, for example, the restaurant hosts several beach theme parties.  The female servers wear bikini tops and several blow up baby/toddler pools are brought into the restaurant.  During these theme parties, the female servers are expected by Defendants Casabona and Lozado to get into the baby/toddler pools and splash around with one another for the amusement of the male patrons.

41.     During last year's Thanksgiving theme event, these same baby/toddler pools were filled with cranberry sauce for the purposes of the women wrestling in the pools.

42.     In a recent promotion, the restaurant advertised a typical Wednesday night special:



43.

44.     On "wild" nights, female servers are expected to ride the bull with one another. During the ride, the Johnny Utah's DJ periodically stops the music and announces over the microphone that if the female employees who are riding the bull "make out" with each other, there will be a free round of shots of alcohol for all customers.  The customers yell and scream for the female employees to kiss one another. The female employees are expected to submit to the degradation and all customers receive free alcohol.

45.     Defendants routinely request that female servers and female customers take off their shirts before they ride the bull, by saying over the microphone such things as, "this bull can't start until you take your shirt off."

## Appearance Criteria Of The Female Servers

46.     Only women serve food at Johnny Utah's.  In addition to the female servers, the restaurant employs female hostesses, the Daisy Dukes girls, also called the "shots girls" and fifty (50%) percent of the bartending staff is female.

47.     At all relevant times, Defendant Casabona, who is approximately 39 years old, was the individual in charge of operating and managing Johnny Utah's on a daily basis.  Defendant Casabona at all times reported to Defendant Sullivan. Defendant Lozado and all other employees reported to Defendant Casabona.

48.     The female servers at Johnny Utah's are required to dress provocatively, look sexy and appear "available."  In order to appear available, female employees are told not to wear engagement rings or wedding bands.  Defendants Casabona and Lozado tell the female servers that "as soon as you walk in here, you are single."

49.     All female employees are expected to be thin, attractive and devote considerable attention to their hair and make-up.  Defendants Casabona and Lozado tell certain women to wear their hair down, instruct women what to wear, tell them not to dress in "grandma clothing," and to wear more make-up.

50.     If a female employee arrives to work and Defendants Casabona or Lozado does not think that she looks attractive enough, she is degraded and belittled in front of other employees. Defendants Casabona or Lozado regularly demean the female servers, calling some of them "ugly," "stupid" and "idiots" in front of their co-workers.

51.     Female employees are also told not to wear eyeglasses because Defendants Casabona and Lozado believe that this makes them less attractive.

52.     Failure of female servers to successfully dress in sexy, attractive outfits and look their best results in reprimands by Defendants Casabona and Lozado, and threats to eliminate shifts or opportunities to work private party events, the most lucrative opportunities for the female servers.

53.     On a regular and consistent basis, Defendants Casabona and Lozado tell female servers that the "customers are here to look at you," and therefore they need to "step it up" and "look the part."   In response, the female servers understand that they must wear sexually provocative clothing and look sexy for the purpose of pleasing the male customers.

54.     Although female servers regularly requested the opportunity to wear clothing that was considered less sexy, including requests to wear sweaters or long sleeve shirts over the cut-off t-shirts in the winter, Defendants denied the requests.

55.     The required "Daisy Dukes" uniform of cut-off denim shorts and tight cut-off shirts accentuates the female employees' bodies and is intended to stereotype the women as sex objects.

56.     At all relevant times, male employees are not required to dress in a sexually provocative manner or critiqued on their physical appearance by Defendants.  Male employees wear long sleeved shirts and jeans.

57.     The clothing that the female servers are required to wear, and the emphasis on looking sexy and acting "available" to the patrons placed the female servers at increased risk and probability of being targeted with unwelcome sexual advances by male customers, including touching, grabbing, groping, and requests to have the women sit in their laps.

58.     The clothing that the female servers are required to wear, and the emphasis on looking sexy and acting "available" to the patrons placed the female servers at increased risk and probability of being targeted with unwelcome lascivious and sexually provocative remarks by male customers.

59.      At all relevant times, Defendants' control and regulation of the female servers' appearance is not related to the ability of the employees to efficiently and properly satisfy their job tasks and responsibilities of serving food and drinks to customers.

60.     Defendants' requirement that the female servers wear the Daisy Dukes uniform or tight jeans, tight shirts and cut-off t-shirts is not a bona fide occupational qualification for the job of server, hostess or bartender.

61.     Defendants' requirement that the female servers dance on top of the bar, pour shots from the bottle into male customers' mouths, ride the bull, kiss one another on the bull, take their shirts off, sit on customers' laps, submit to unwelcome physical touching, groping and other unwanted sexual contact by male customers is not a bona fide occupational qualification for the job of server, hostess or bartender.

62.     A bona fide occupational qualification does not exist for only female employees to work as servers, hostesses or Daisy Dukes girls at Johnny Utah's.

63.     The female servers are not "entertainers," dancers or "performers."  At all relevant times, Johnny Utah's operates as a restaurant and bar, and does not hold itself out as a strip club or a gentleman's club.

64.     Johnny Utah's is in the business of selling food and alcohol to the public, not providing adult entertainment to heterosexual men.

65.     The average age of the female servers is 23 years old.  Upon information and belief, more than 95% of the female servers are under the age of 26, and only one female server is over the age of 30. This employee is 31 years old.[1]

66.     Upon information and belief, and as set forth *infra*, at all relevant times Johnny Utah's has and does employ female servers who are under the age of 21.

67.     As part of their employment, the female servers under the age of 21 were encouraged to drink excessive amounts of alcohol during their work shifts.   At all times, Defendants Casabona and Lozado knowingly and intentionally coached the underage female servers to drink excessive amounts of alcohol and further supplied these same employees with more alcohol at the end of the evening.

### Female Servers Must "Throw The Party" Or Risk Termination

68.     The female servers are ranked by Defendants Casabona and Lozado by their ability to "throw the party" and thereafter assigned shifts, sections of the restaurant and private party events based on this assessment.

69.     On a regular and daily basis, Defendants used the specific phrase "throw the party" when instructing the female servers on how to perform their jobs and responsibilities.

70.     To "throw the party" means that the female server will successfully "engage and entertain" her customers during their stay at Johnny Utah's.  To accomplish this, Defendants Casabona and Lozado expect that the female servers will, at a minimum, engage in the following conduct:

- get on top of the bar and pour shots of alcohol into male customer's mouths;
- dance on the bar;
- ride the mechanical bull alone, with other female servers and with older male customers;

---

[1]  Plaintiffs reserve the right to amend the class complaint to add claims for age discrimination on behalf of female servers should evidence show that hiring was restricted to women under the age of forty (40) years.

- Drink alcohol with their male customers during their work shifts;
- Encourage male customers to buy them shots of alcohol;
- Flirt with their male customers and at all times appear "available";
- Be open to suggestions from male customers to go out after their shifts;
- Sit on the laps of their male customers;
- Laugh off sexually offensive remarks about their bodies and appearance; and
- Not object to unwelcome physical sexual advances by male customers, including but not limited to unwanted touching, grabbing, groping, hugging, kissing and slapping of their buttocks.

71.     As detailed *infra*, the failure of a female server to properly "throw the party" results in threats of reduced shifts or termination.

## Harassment By Defendants

72.     The female servers reported directly to Defendant Lozado, who was responsible for creating the weekly schedules and assigning employees to specific shifts, sections of the restaurant during shifts, and delegating which employees were assigned to work private party events.

73.     On a regular and daily basis, Defendants Casabona and Lozado would openly comment on the physical appearance of the female servers, and critique their bodies, clothing, hair and make-up.   Defendants would publicly discuss which female servers were the most attractive and the best at "throwing the party" in order to determine who was assigned the most lucrative sections of the restaurant during shifts.   If a female server had not been regularly "throwing the party," she was placed in the least desirable section of the restaurant.

74.     For the women who were not as successful at throwing the party, Defendants Casabona and Lozado publically questioned them as to why more male customers were not buying the servers shots or why they were not riding the mechanical bull.   They said such things as "you need to be "a team player," "have more fun," "loosen up" and "drink more shots."

75.     When Defendant Sullivan, the owner, would visit Johnny Utah's, Defendants Casabona and Lozado discussed which female server was the best at "throwing the party" in order to decide who would serve Defendant Sullivan.

76.     The female servers particularly dreaded being assigned to throw the party for Defendant Sullivan and his friends.  If a server refused to do what Defendant Sullivan wanted her to do, she was fired within days of his visit to Johnny Utah's.  If Defendant Sullivan wanted a female server to dance for him or allow him to repeatedly grab her body, she had to agree or risk termination.

77.     The female server assigned to his table was required to, and in fact, did drink shots with Defendant Sullivan and his friends, sit on his lap and the laps of his friends, ride the bull with his friends, and otherwise permit Defendant Sullivan and his friends to inappropriately grab, touch, fondle and grope the female server's body throughout the evening.  As part of throwing the party, the female server was also expected not to object to unwelcome lascivious and sexually provocative remarks regarding her and her coworkers.

78.     The female servers were also subject to unwanted sexual advances by Defendant Casabona.  Specifically, on a regular and consistent basis, Defendant Casabona would ask female servers to go out to "party" with him at other bars after work. Because Defendant Casabona was the highest level manager, there was inherent pressure on the female servers to agree to go with him.

79.     Although Defendant Casabona generally asked those female servers who were more intoxicated than other employees, he generally and regularly asked several girls at a time to go with him.  On numerous occasions, after being out at other bars and drinking, Defendant

Casabona would ask female servers to go back to his apartment with him, including the female servers who were under the age of 21 years.

80.     On a constant and regular daily basis, the female servers were the recipients of inappropriate sexual remarks about their bodies by Defendants.

81.     On a constant and regular daily basis, the female servers were strongly encouraged by Defendant Casabona to drink excessive amounts of alcohol during their work shifts to the point of extreme intoxication.

82.     If a female server was favored by Defendants Casabona or Lozado, she received the best weekly shifts, more hours and was assigned private party events. Female servers who were perceived by Defendants as less "fun" and less willing to party than other employees, received more day time shifts and less private party events, resulting in less money for the female server.

83.     One female server who was known to be "dating" the bar manager, consistently received the best Friday and Saturday night shifts to the detriment of the other female servers who were not "dating" a manager.

84.     On a regular and consistent basis, the female servers experienced and were subjected to anger, intimidation and retaliatory conduct by Defendants Casabona and Lozado when they failed to meet the appearance criteria of Defendants or act in the alluring and provocative manner as required to "throw the party."

85.     Female servers experienced and witnessed Defendant Casabona engage in multiple angry outbursts, which included Defendant Casabona physically throwing and destroying chairs, tables and other items, such as computer equipment and dinner plates. During these physical outbursts, Defendant Casabona yelled and used excessive profanity.  At 6'2" and approximately 250 pounds, the female servers were intimidated by Defendant Casabona.

86.     On numerous occasions, the female servers experienced and witnessed Defendant Casabona repeatedly punch, strike and hit doors in the restaurant, including interior office doors. Employees heard the punching and striking of the doors, along with the yelling and profanity by Defendant Casabona.

87.     On a regular and consistent basis, Defendants Casabona and Lozado would yell, berate and intimidate the female servers to the point where the employee was reduced to tears in front of her co-workers and customers.

88.     Knowing Defendant Casabona's temper and his propensity for physical angry outbursts, the female employees were afraid of him and fearful when they were the subject of his anger.

### Representative Plaintiffs of the Female Service Employees Class
### Stephanie Sanz

89.     Stephanie Sanz worked at Johnny Utah's from January 2012 through June 11, 2014 as a server. She was 23 years old when hired and a student at Columbia University.

90.     Sanz and the other female servers were required to report for evening shifts by 4:30 p.m. and lunch shifts by 11:30 a.m.  Regularly and generally, Sanz and the servers were expected to work until 1:30 a.m., and often as late as 3:00 a.m.  The servers were not permitted to take any breaks during their shifts.

91.     Sanz began experiencing anxiety shortly after starting work at Johnny Utah's. She had never drank shots of alcohol before working at Johnny Utah's and it was difficult for her to drink during her shifts.  She was also uncomfortable flirting with the male customers and dancing on the bar.

92.     However, Defendants Casabona or Lozado reprimanded Sanz and told her that she was not "throwing the party."  Defendants told Sanz that if she wanted the weekend shifts and the good sections of the restaurant she needed to "flirt more," "drink more with her tables," and learn how to "throw the party." Implicit in the Defendants' comments was the message that her hours would be reduced if she could not improve her ability to "throw the party."

93.     Because she needed the money and was fearful that she could not find another job with equal pay, Sanz tried to ignore her anxiety and perform the acts required to be a server at Johnny Utah's.  This meant that she did not complain to Defendants Casabona or Lozado when male customers grabbed, groped, and touched her body, including her breasts and buttocks, without her consent.  Sanz reasonably believed that if she had complained to Defendants that they would be angry and accuse her of not "throwing the party."  Unfortunately, Sanz's anxiety increased and she eventually began having panic attacks.

94.     At all relevant times during her employment, Sanz was repeatedly told by Defendants Casabona or Lozado during staff meetings, and individually, that she was expected to look as attractive as possible for work, flirt with patrons, appear to be "available," get on top of the bar and pour shots of alcohol into male customer's mouths, dance on the bar, drink alcohol with her male customers during her shifts, encourage male customers to buy her shots of alcohol, be open to suggestions from male customers to go out after work, sit on her customers' laps, laugh off sexually offensive remarks and not complain about unwelcome physical contact from male customers.

95.     On the nights that Sanz did not drink as much as Defendants expected her to, she was told by Defendant Lozado that she was not a "team player," was "boring," had "low energy," and was "not showing the customers a good time."

96.     The humiliation and degradation that she experienced as a server resulted in increased anxiety, depression and panic attacks.  Sanz began seeking medical treatment and requested that she no longer be scheduled on the weekend night shifts and asked to be placed on day time shifts and mid-week night shifts only.  Sanz continued to work this reduced schedule and occasionally filled in for other co-workers when needed.

97.     In April 2014, Defendants Casabona and Lozado told the female servers that they needed to assist the Daisy Dukes girls and hand out promotional flyers to potential customers on the street.

98.     Sanz was degraded and humiliated when forced to stand outside and hand out promotional flyers.

99.     Sanz complained to Defendants Casabona and Lozado about handing out the flyers. She told them that she was being harassed by men and it was causing her anxiety to perform this task.  Defendants Casabona and Lozado responded by telling Sanz that she was "being ridiculous," and her complaints were "crap."  Defendants refused to acknowledge that she felt objectified and specifically asked her whether "she wanted to work at Johnny Utah's or not."  Sanz was told that if she wanted to work at Johnny Utah's, she must hand out the flyers.

100.     During the course of Sanz's period of employment at Johnny Utah's, she regularly and consistently received unwelcome sexual comments and propositions from male customers. She was also regularly and consistently physically touched, grabbed, and groped by male customers.  She reasonably believed that complaining about such unwelcome sexual harassment would cause the Defendants to reduce her weekly shifts and private party events.

101.     Sanz worked during the 2013 Thanksgiving female "cranberry-wrestling" theme event.  Sanz was humiliated, degraded and ashamed that her employer was hosting such an event.

102.     Sanz was asked to go out to "party" with Defendant Casabona at other bars during nights that she worked at Johnny Utah's. Sanz agreed to go with him because she feared that her work hours would be reduced if she did not.

103.     Sanz, along with one of her co-workers, was asked by Defendant Casabona to go back to his apartment after her shift ended.  Sanz declined.

**Annya Santana**

104.     Annya Santana worked at Johnny Utah's from September 2013 through June 2014, as a server.  She was 25 years old when hired.

105.     Santana is Dominican, has curly black hair and wears glasses.   During her employment, she was the only female employee with dark skin.  She is also married.

106.      Defendants still expected her to appear available and act single while working at Johnny Utah's.

107.     Defendant Lozado regularly and consistently would remark to her that she is not attractive when wearing her eyeglasses and that she needed to wear contact lenses. Defendant Lozado even sent her a coupon for the purchase of contact lenses.  At some point during her employment, her glasses were "lost" at Johnny Utah's and have not been located.  Rather than replacing her eyeglasses, Santana worked without glasses until her employment ended.

108.     Defendant Lozado regularly and consistently berated Santana about her overall appearance, unattractiveness and lack of sexiness. For example, on a regular basis she was criticized for not straightening her curly hair, not wearing enough make-up and putting her hair into a ponytail. In front of other employees, Defendant Lozado would tell Santana that she "looked like shit," and needed to "be sexier."  He also regularly told her that Defendant Casabona did not like Santana's "look."

109.    Although she was married, Santana was instructed by Defendant Lozado that she was "single" the minute she walked into Johnny Utah's for a shift.

110.    Santana was reprimanded for not "throwing the party" on multiple occasions. She was reprimanded for not drinking shots of alcohol with her customers and therefore appearing "too serious" and "not fun."

111.    On more than one occasion, Santana witnessed Defendant Casabona's angry outbursts and excessive intoxication. She saw him throw and break chairs in anger several times. She also saw him throw and break a computer printer while intoxicated. Santana was intimidated by Defendant Casabona and afraid that she would be the subject of an angry outburst.

112.    At all relevant times, Santana endured the unwelcome sexual harassment and policies and practices of Defendants in order to keep her job. On numerous occasions, Santana left work anxious, depressed and in tears.

### Daisy Dukes Girls

### Jessica Wafer, Stephanie Walsh and Katelyn Canning

113.    Jessica Wafer worked at Johnny Utah's from August 2012 through November 2013, as a Daisy Dukes girl and shot girl. She was 23 years old when hired.

114.    Stephanie Walsh worked at Johnny Utah's from May 2013 through May 2014, as a Daisy Dukes girl and shot girl. She was 22 years old when hired.

115.    Katelyn Canning worked at Johnny Utah's from January 2013 through November 2013, as a Daisy Dukes girl, shot girl and bartender. She was 24 years old when hired.

116.    The Daisy Dukes girls were required to take hundreds of promotional flyers to distribute on the streets of Manhattan. Typically, three or four female employees would go out together for hours at a time to hand out the flyers. The Daisy Dukes girls had to write their initials

on the flyers and for each customer who came to Johnny Utah's and handed in a flyer with her initials, she received $2, in addition to her base pay of $5.00 an hour.

117.    The Daisy Dukes girls passed out the flyers all year long, regardless of the weather, and had to stay out until after midnight on numerous occasions because they were told not to return until the restaurant was full.  At all times they were required to wear cowboy boots, cut-off denim shorts and cut-off shirts.

118.    From approximately 11:00 p.m. to 4:00 a.m., the Daisy Dukes girls worked in the restaurant selling shots of alcohol. They earned $1 for every shot of alcohol they sold.  Unlike the other female servers, they did not pool their tips.

119.    On busy weekend nights, at least one Daisy Dukes girl would walk around the bar and solicit email addresses and other contact information from customers for purposes of sending promotional emails and links to the Johnny Utah's Facebook page.  They received 25 cents for each email address they obtained.

120.    The Daisy Dukes girls were told by Defendants Casabona and Lozado to use their discretion when deciding which customers to ask for email addresses.  Despite this directive, the female employees understood that there was a specific target group of customers that Defendants Casabona and Lozado considered good customers.

121.    The good customers were generally white males between the 21 and 30 years of age.  The bad or wrong customers, as explained by Defendants Casabona and Lozado, were black males and females of any age group, as well as Hispanic males and females.  If a black or Hispanic customer came to Johnny Utah's with a promotional flyer that he or she received via email, the employee who obtained that customer's email address was reprimanded by Defendants Casabona or Lozado and reminded of the fact that there were right and wrong customers at Johnny Utah's.

122.     In order to avoid being yelled at by Defendants Casabona or Lozado, the Daisy Dukes girls followed their supervisors' directives and did not solicit email addresses or contact information from black or Hispanic customers.

123.     This same practice was used with respect to handing out the promotional flyers between 9:00 p.m. and 12:00 a.m. in and around Rockefeller Center. The Daisy Dukes girls knew that flyers should not be given to black and Hispanic males.

124.     At all relevant times during Plaintiffs' employment, the Daisy Dukes girls were instructed that part of their job was to look "sexy" and "hot."  Defendants reprimanded the Daisy Dukes girls if they arrived to work and did not look sexy enough to please Defendants Casabona or Lozado.

125.     As detailed *supra*, the Daisy Dukes girls were directed and instructed by Defendants Casabona and Lozado about what it meant to "throw the party" at Johnny Utah's. Wafer, Walsh and Canning understood that if they complained about male customers kissing, grabbing, touching, groping, or slapping them on their buttocks, that they would be reprimanded by Defendants Casabona and Lozado and told that they need to "take this for the team" because it is "part of the job."

126.     At all relevant times, Wafer, Walsh and Canning endured the unwelcome sexual harassment and policies and practices of Defendants in order to keep their jobs.

### Hostesses

### Nykya Luce

127.     Nykya Luce worked as a hostess at Johnny Utah's from February 2014 through June 2014.  On a regular basis Luce worked from 5:00 p.m. to 2:00 a.m., and sometimes to 4:00 a.m.  During this time, Luce and all other hostesses did not receive breaks.

128.   Luce was paid $12 an hour for her work as a hostess.  At least one night a week, Luce was required to sign out at 7:00 p.m. and thereafter work the rest of the night off the clock.

129.   She was paid $10 an hour in cash for the off the clock work. During this time, she assisted customers who had received promotional emails from the Daisy Dukes girls for an open bar. Customers who received this promotion could purchase a wristband for $35 that allowed them to drink as much alcohol as they wanted to for two (2) hours.  Luce collected the $35 and placed wristbands on customers.

130.   During her employment at Johnny Utah's, Luce and the other hostesses were expected to and did wear sexually provocative clothing.  In addition to wearing cut-off denim shorts and cut-off shorts, Luce was reminded by Defendant Lozado to wear low-cut revealing shirts and very short skirts or dresses.  On the rare occasions in which Luce wore clothing that Defendant Lozado considered not sexy enough, she was reprimanded and told to go home and change.

131.   Luce and the other hostesses were forced to drink excessive amounts of alcohol during their work shifts and reprimanded by Defendants Casabona and Lozado if they did not. Generally, during her shift, Luce would be told by Defendants Casabona and Lozado that she needed to go to the bar and drink a shot with one of them. If Defendant Casabona directed her to drink shots with him, Luce was forced to drink shots of whiskey, his preferred drink.

132.   Luce and the other hostesses were required to climb onto the bar and dance in front of the customers, ride the mechanical bull with customers and one another.  On one occasion, Defendant Casabona told her to ride the bull with a male customer who was only 18 years old. Luce refused and was retaliated against by Defendant Casabona for her refusal.

133.   Defendants repeatedly asked the hostesses, over the microphone for all customers to hear, to take off their shirts when riding the mechanical bull.

134.   On numerous occasions, Luce and other hostesses, including several under the age of 21, were asked to go out and "party" with Defendant Casabona after work.   Afraid and intimidated by Defendant Casabona, Luce agreed.

135.   On multiple occasions, Luce witnessed Defendants Casabona and Lozado publically degrade and humiliate other female employees for being ugly, stupid, not sexy enough and not throwing the party to their satisfaction.   Their reprimands and angry outbursts regularly reduced the female employees to tears in front of their co-workers.

## **Wage and Hour Violations**

### **Failure to Pay Overtime Wages to all Service Employees**

136.   At all relevant times, Defendant Johnny Utah's, and its managers and supervisors, knowingly and intentionally engaged in multiple violations of the FLSA and NYLL. While working for Defendants, Plaintiffs and Class members were regularly required to perform work for Defendants without receiving proper minimum wages, overtime compensation and spread of hours compensation as required by applicable federal and state law.

137.   "Service employees" are the female servers, Daisy Dukes girls, hostesses, bartenders, bussers/runners and bar backs at Johnny Utah's.

138.   Johnny Utah's is open daily during the following hours:

> Monday - Thursday: 11:30 a.m. to 3:00 a.m.;
> Friday: 11:30 a.m. to 4:00 a.m.;
> Saturday: 11:00 a.m. to 4:00 a.m.; and
> Sunday: 10:00 a.m. to 12:00 a.m.

139.   The kitchen closes for food service at 12:00 a.m. each day.

140.    Service employees generally and regularly worked over ten (10) hours a day and often worked twelve (12) to fourteen (14) hours a day.

141.    Service employees regularly worked from 4:30 p.m. to 4:00-5:00 a.m., more than ten (10) hours in one day.  Service employees who regularly worked double shifts from 11:00 a.m. to 12:00 a.m. or later, worked more than twelve (12) hours in one day.

142.    Even though the restaurant closed at 3:00 or 4:00 a.m., service employees had to remain at work in order to clean up and prepare for the next day. The clean-up often took over one (1) hour.

143.    Upon information and belief, all female servers who worked at Johnny Utah's generally and regularly were required to work from twelve (12) to fourteen (14) hours or more a day, and generally worked more than forty (40) hours a week.  All female servers were told by the Defendants that they would be compensated at an hourly rate of $5.00 plus tips.

144.    Upon information and belief, all bartenders who worked at Johnny Utah's generally and regularly were required to work from twelve (12) to fourteen (14) hours or more a day, and generally worked more than forty (40) hours a week.  All bartenders were told by the Defendants that they would be compensated at an hourly rate of $5.00 plus tips.

145.    Upon information and belief, all bussers/runners and bar backs who worked at Johnny Utah's generally were required to work from twelve (12) to fourteen (14) hours, or more a day, five or six days a week.  All bussers/runners and bar backs were told by the Defendants that they would be compensated at an hourly rate of $5.00 plus tips.

146.    Upon information and belief, all Daisy Dukes girls who worked at Johnny Utah's generally were required to work four (4) to six (6) hours a day handing out promotional flyers and five (5) to six (6) hours a day selling shots of alcohol.  All Daisy Dukes girls generally worked

more than forty (40) hours a week.  All Daisy Dukes girls were told by the Defendants that they would be compensated at an hourly rate of $5.00 for the hours spent handing out flyers on the street.  Additionally, they were told that they would receive $2 for every customer who came to Johnny Utah's with a promotional flyer with their initials on it.  On an average night, however, less than eight (8) customers in total would hand in promotional flyers.  The three (3) to four (4) Daisy Dukes girls working, on average, did not earn minimum wages for the hours spent handing out flyers.

147.   During the hours that the Daisy Dukes girls sold shots of alcohol, they were told by the Defendants that they would be compensated at an hourly rate of $5.00 plus tips.

148.   Upon information and belief, all hostesses who worked at Johnny Utah's generally were required to work from twelve (12) to fourteen (14) hours, or more a day, and generally worked more than forty (40) hours a week.  All hostesses were told by the Defendants that they would be compensated at an hourly rate of $12.00.  The hostesses did not receive tips.

149.   Although all service employees regularly and consistently worked more than forty (40) hours in one work week, including working between sixty (60) and seventy (70) hours in one work week, at all relevant times, the employees only received payment for hourly wages of forty (40) hours or less.

150.   All service employees were required to clock in and out for each shift worked.  The time entries as submitted by the service employees contemporaneously with their hours worked show that the service employees regularly and consistently worked more than forty (40) hours in one work week.

151.    As detailed below, these contemporaneous time records were used on a daily basis by the Defendants to calculate distributions of the mandatory tip pool for the servers, bartenders, bussers/runners, and bar backs.

152.    However, on a daily and/or weekly basis, Defendants Casabona and Lozado intentionally altered and deleted time entries in the computer time system.  Multiple service employees witnessed Defendants making these deletions and alterations.

153.    Additionally, bussers/runners and bar backs were regularly told by Defendants Casabona and Lozado to not enter their time on certain days and to clock out early but continue working.

154.    The fact that bussers/runners and bar backs regularly worked "off the clock" was a well-known fact among the employees at Johnny Utah's.

155.    All hostesses were regularly told that "no one works more than 40 hours at Johnny Utah's."  If they worked more than 40 hours, they understood that they would not receive hourly wages.  On numerous occasions, hostesses were told to clock out and to continue working.

156.    Based on the intentionally altered and deleted time entries in the computer time system by Defendants Casabona and Lozado, service employees' paychecks reflected weekly hours of forty (40) hours or less.

157.    Additionally, the service employees' paychecks for their hourly wages were always zeroed out, such that the employees' hourly paychecks totaled $0.00 for almost every week that Plaintiffs and Class members worked.

### Tip Pool Violations

158.    At all relevant times, Johnny Utah's required the servers and bartenders to pool their tips each shift.  As part of the mandatory tip pool, bussers/runners and bar backs received a percentage of the total tips.

159.    The servers and bartenders had to submit their cash tips in an envelope at the end of each night to Defendants Casabona and Lozado.  Also calculated and written on this envelope was the amount that each employee made in credit card tips.

160.    If a female server had worked a private party during a shift, the earned tip from this was also included in the employee's total.

161.    Based on a calculation of the number of hours that each employee worked, as reflected in the time keeping system, and the gross tip pool amount, each employee received a percentage of the tip pool.

162.    At all times, Defendants Casabona and Lozado made the final calculations of tip pool distributions and purportedly entered these calculations on excel sheets created on a daily basis.  The excel sheets purportedly show the actual and accurate number of hours that each employee worked.

163.    These excel sheets were never provided to the service employees to review nor were copies provided to them at any time.  As such, once employees handed in their envelopes, they had no involvement with the tip money and were not told how the tips were distributed or what amounts were distributed to whom.

164.    At all relevant times, the service employees were never told by Defendants how much money was generated in tips on any given day nor were they told what the total collective "tip pool" was at the end of a shift in which tips were pooled.

165.     In fact, Defendants never provided the service employees with any records of collective tip pool amounts at any time.   Defendants similarly failed to inform all service employees the method, standards, calculations or policies, if any, in effect which governed the specific percentage of the tip pool each employee received.

166.     Upon information and belief, Defendants failed to distribute 100% of the tip pool to the service employees.

167.     Further, upon information and belief, Defendants allowed those with managerial authority and ownership interests to share in the tip pool, including but not limited to the bar manager.

168.     Upon information and belief, Defendants regularly removed cash from the tip pool at the end of a shift and used a portion of the cash to pay certain bussers/runners, bar backs and other employees, such as the doormen.   The removed funds would not be included in the total amount of collected tips subject to distribution amongst the service employees.

169.     Upon information and belief, the Defendants maintained a cash register behind the bar that was used exclusively for purchases made with cash.   There were typically two bartenders assigned to this register.   Unlike all other registers in Johnny Utah's, this cash register did not have a point of sale ("POS") system, and therefore these purchases were not tracked or recorded in any manner.

170.     Upon information and belief, Defendant Sullivan would remove the cash from this register every two (2) to three (3) weeks.

**Failure To Withhold Taxes And Misrepresentation Of Reported Tip Earnings**

171.     At all relevant times, Defendants failed to accurately and lawfully withhold federal, state and city taxes from employees' paychecks. Defendants failed to tell employees that all

required withholdings were not being made.  This failure to pay required taxes by Defendants caused service employees to incur substantial end of the year federal, state and city tax penalties.

172.    On a regular basis, Defendants over-stated and/or misrepresented to payroll and state and federal tax authorities the amount of money that service employees earned in tips for any given pay period.  The failure to accurately record and/or intentionally misrepresent the service employees' tip earnings resulted in further economic harm to Plaintiffs and class members.

### Bryan Harmin

173.    Plaintiff Bryan Harmin ("Harmin") worked at the Restaurant from May 2012 through June 2013.  Harmin, and all other bartenders, were told by Defendants that they would be paid $5.00 an hour, plus tips.  Harmin clocked in and out of every shift that he worked.

174.    On a regular basis, Harmin worked in excess of 40 hours a week, often working 60-70 hours in one week. On a typical Saturday night shift, Harmin worked from 5:00 p.m. to 4:00 a.m.  When Harmin worked a double-shift, he worked from 11:00 a.m. to 4:00 a.m.

175.    However, every paycheck received by Harmin during his employment showed that Harmin worked only 40 hours each week. Harmin never received compensation for any hour worked over 40 hours, nor did he receive overtime hours or spread of hours pay.

176.    At all relevant times, Defendants failed to accurately and lawfully withhold federal, state and city taxes from employees' paychecks.  For example, for the 2012 tax year, Defendants only withheld $90 in taxes from Harmin's wages resulting in a substantial tax payment from Harmin for the failure to pay.  Defendants failed to tell employees, including Harmin, that all required withholdings were not being made.

177.    On a regular basis, Defendants over-stated the amount of money that employees earned in tips for any given pay period. For example, during a week in which Harmin earned $400

in tips, his paycheck reflected that he earned $800 in tips, even though accurate records and calculations of the tip pool were made by employees at the end of each shift and provided to Defendants.

**Oscar Rojas**

178.    Oscar Rojas ("Rojas") worked as a busser/runner and bar back at Johnny Utah's from August 2013 through May 2014.

179.    Rojas, and all other bussers/runners and bar backs, were told by Defendants that they would be paid $5.00 an hour, plus tips.  Rojas clocked in and out of every shift that he worked. On a regular basis, Rojas worked in excess of 40 hours a week, often working 60-70 hours in one week. On a typical Saturday night shift, Rojas worked from 5:00 p.m. to 5:00 a.m.  When Rojas worked a double-shift, he worked from 11:00 a.m. to 5:00 a.m.

180.    However, every paycheck received by Rojas during his employment showed that Rojas worked only 40 hours each week. Rojas never received compensation for any hour worked over 40 hours, nor did he receive overtime hours or spread of hours pay.

181.    On multiple occasions, Rojas and the other bussers/runners and bar backs, were told by Defendants to punch out despite the fact that it was hours before their shift was scheduled to end.  Rojas and his co-workers were forced to work numerous hours on a weekly basis off the clock.

182.    Rojas did not complain about the off the clock hours because he reasonably feared that he would be fired if he objected to the practice.

183.    At all relevant times, Rojas was never told by Defendants how much money was generated in tips on any given day nor was he told what the total collective "tip pool" was at the end of a shift in which tips were pooled.

184.    Defendants never provided Rojas with any records of collective tip pool amounts at any time.  Defendants failed to inform Rojas of the method, standards, calculations or policies, if any, in effect which governed the specific percentage of the tip pool each employee received.

185.    During his employment at Johnny Utah's, Rojas had no knowledge as to the percentage that he was supposed to receive from the collective tip pool, or what percentage he actually did receive.

## CLASS ACTION ALLEGATIONS

186.    Plaintiffs Stephanie Sanz, Annya Santana, Nykya Luce, Jessica Wafer, Katelyn Canning and Stephanie Walsh bring the First and Second Causes of Action under Rule 23 of the Federal Rules Of Civil Procedure, on behalf of themselves and all other similarly situated individuals, as defined: All former and current Johnny Utah's female servers, bartenders, hostesses and Daisy Dukes girls (collectively, the "female servers") who worked between June 11, 2011 through the resolution of this action, for Defendant Johnny Utah's and any of its predecessors (the "Female Service Employee Class").

187.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint. Excluded from the Class are Defendants and its affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, its affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

188.    Plaintiffs are members of the Class they seek to represent.  This action is properly maintainable as a class action.  The proposed Class is so numerous that joinder of all members is impracticable.

189.    There are questions of law or fact common to the Class which predominate over any questions affecting only individual members. Common questions of fact or law include, but are not limited to the following:

a.   Whether Defendants have and continue to enforce policies and procedures that discriminate against female service employees;

b.   Whether Defendants have and continue to enforce policies and procedures that violate the NYCHRL and NYSHRL;

c.   Whether Defendants have and continue to enforce policies and procedures that force  female service employees to endure adverse employment actions affecting and altering the terms, conditions and privileges of their employment;

d.   Whether Defendants have and continue to enforce unlawful policies and procedures against their female service employees, including the requirement that all female service employees drink alcohol with their customers during their work shifts;

e.   Whether Defendants have and continue to enforce an unlawful policy and procedure that requires their female service employees who are under 21 years old to drink alcohol with their customers during their work shifts;

f.   Whether pursuant to the NYSHRL, Defendants Sullivan, Casabona and Lozado are "aiders" and "abettors" of the discrimination; and

g.   Whether the female service employees are entitled to equitable and injunctive relief, and to recover compensatory damages and punitive damages.

190.    The representative Plaintiffs' claims are typical of those of the proposed Class and are based upon the same legal theories. The representative Plaintiffs' claims all arise out of the same practices and course of conduct of Defendants.

35

191.    The representative Plaintiffs' damages arise out of a pattern of nearly identical and repetitive policies and practices conducted by Defendants.

192.    The representative Plaintiffs can adequately represent the Class. The representative Plaintiffs and their attorneys are experienced in class actions, employment discrimination and are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint.

193.    Class certification is appropriate pursuant to Rule 23(b)(2) because Class members are entitled to injunctive relief to end Defendants' common, uniform, unfair, and discriminatory policies and practices.

194.    Class certification is also appropriate pursuant to Rule 23 because common questions of fact and law predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. The Class members have been damaged and are entitled to recovery as a result of Defendants' common and discriminatory policies and practices.

## **COLLECTIVE ACTION ALLEGATIONS**

195.    Plaintiffs Stephanie Sanz, Bryan Harmin, Annya Santana, Nykya Luce, Jessica Wafer, Katelyn Canning, Stephanie Walsh and Oscar Rojas bring the Third and Fourth Causes of Action under pursuant to the FLSA on behalf of themselves and: All former and current female servers, Daisy Dukes girls, hostesses, bartenders, bussers/runners and bar backs (collectively, "service employees") who worked at Johnny Utah's between June 11, 2011, through the resolution of this action, to remedy Defendants' wage and hour violations of the FLSA (the "Collective Action Class").

196.    Plaintiffs and the Class consist of similarly situated employees who performed work for Defendants as service employees in jobs incidental to Defendant Johnny Utah's operations. The number and identity of the Class members are determinable from the records of Defendants.   For purposes of notice, their names and addresses are readily available from Defendants.

197.    At all relevant times, Plaintiffs and Class members are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in willful wage and hour violations.

198.    The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court.   In addition, the names of all potential members of the putative class are not known.   The facts on which the calculation of that number, however, are presently within the sole control of Defendants, and upon information and belief, there are more than forty (40) members of the Class.

199.    Plaintiffs' claims are typical of those claims, which could be alleged by any member of the Class, and the relief sought is typical of the relief, which would be sought by each member of the Class in separate actions. All the Class members were subject to the same corporate practices of Defendants, as alleged herein, of failing to pay minimum wage, overtime compensation, "spread of hours" premiums, and misappropriated tips. Defendants' policies and practices affected all Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiffs and other Class members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

200.     Plaintiffs are able to fairly and adequately protect the interests of the Class and have

no interests antagonistic to the Class. Prosecution of separate actions by individual members of

the Class would create a risk of inconsistent and/or varying adjudications with respect to the

individual members of the Class, establishing incompatible standards of conduct for Defendants

and resulting in the impairment of Class members' rights and the disposition of their interests

through actions to which they were not parties.

201.     There are questions of law and fact common to the Class which predominate over

any questions affecting only individual class members, including but not limited to:

    a.   Whether Defendants employed Plaintiffs and Class members within the meaning
of the FLSA;

    b.   What are and were the policies, procedures, and protocols of Defendants regarding
the types of work for which Defendants did not pay the Class members properly;

    c.   Whether Defendants paid Plaintiffs and Class members their lawfully earned
overtime wages in accordance with the FLSA;

    d.   Whether Defendants paid Plaintiffs and Class members their lawfully earned
minimum wages in accordance with the FLSA;

    e.   Whether Defendants properly distributed gratuities earned by Plaintiffs and Class
members in accordance with the FLSA;

    f.   Whether Defendants' policy of failing to pay Plaintiffs and Class members was
instituted willfully or with reckless disregard of the law; and

    g.   The nature and extent of class-wide injury and the measure of damages for those
injuries.

## NYLL CLASS

202.     Plaintiffs Stephanie Sanz, Bryan Harmin, Annya Santana, Nykya Luce, Jessica

Wafer, Katelyn Canning, Stephanie Walsh and Oscar Rojas bring the Fifth, Sixth and Seventh

Causes of Action under Rule 23, on behalf of themselves and all other similarly situated

individuals, as defined: All former and current female servers, Daisy Dukes girls, hostesses,

bartenders, bussers/runners and bar backs (collectively, "service employees") who worked at Johnny Utah's between June 11, 2008, through resolution of this action, to remedy Defendants' wage and hour violations of the NYLL (the "NYLL Class").

203.    Plaintiffs and the Class consist of similarly situated employees who performed work for Defendants as service employees in jobs incidental to Defendant Johnny Utah's operations. The number and identity of the Class members are determinable from the records of Defendants.  For purposes of notice, their names and addresses are readily available from Defendants.

204.    At all relevant times, Plaintiffs and Class members are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, procedures, and rules, all culminating in willful wage and hour violations.

205.    The proposed Class is so numerous that joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court.  In addition, the names of all potential members of the putative class are not known. The facts on which the calculation of that number, however, are presently within the sole control of Defendants, and upon information and belief, there are more than forty (40) members of the Class.

206.    Plaintiffs' claims are typical of those claims, which could be alleged by any member of the Class, and the relief sought is typical of the relief, which would be sought by each member of the Class in separate actions. All the Class members were subject to the same corporate practices of Defendants, as alleged herein, of failing to pay minimum wage, overtime compensation, "spread of hours" premiums, and misappropriated tips.  Defendants' policies and practices affected all Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful

acts as to each Class member. Plaintiffs and other Class members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

207.    Plaintiffs are able to fairly and adequately protect the interests of the Class and have no interests antagonistic to the Class. Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties.

208.    There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including but not limited to:

    a.    Whether Defendants violated the NYLL;

    b.    Whether Defendants failed to pay Plaintiffs and Class members minimum wages for all of the hours they worked;

    c.    Whether Defendants compensated Plaintiffs and Class members for hours worked in excess of 40 hours per workweek;

    d.    Whether Defendants failed to provide Plaintiffs and Class members spread-of-hours pay;

    e.    Whether Defendants misappropriated tips from Plaintiffs and Class members by pooling, counting, distributing, accepting, and/or retaining tips and/or service charges paid by customers that were intended for Plaintiffs and Class members which customers reasonably believed to be gratuities for Plaintiffs and Class members;

    f.    Whether Defendants properly distributed gratuities earned by Plaintiffs and Class members in accordance with the NYLL;

    g.    Whether Defendants failed to keep true and accurate time and pay records for all hours worked by Plaintiffs and Class members, and other records required by the NYLL;

    h.    Whether Defendants' policy of failing to pay Plaintiffs and Class members was instituted willfully or with reckless disregard of the law; and

     i.   The nature and extent of class-wide injury and the measure of damages for those injuries.

## COUNT I
## DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
## IN VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW
### (On behalf of the Female Service Employee Class)

209.    Plaintiffs hereby repeat and reallege all allegations as if fully set forth herein.

210.    Defendant Johnny Utah's is an "employer" as defined in the NYCHRL.

211.    Plaintiffs and Class members are "employees" as defined in the NYCHRL.

212.    Pursuant to § 8-107(1)(a), Defendants Casabona and Lozado are employees or agents of Defendant Johnny Utah's, and are individually liable for the discriminatory conduct.

213.    NYCHRL § 8-107 makes it an unlawful discriminatory practice:

> For an employer, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person to discriminate against such person in compensation or in terms, conditions or privileges of employment.

214.    Defendants violated the rights of the Plaintiffs and Class members under the NYCHRL by discriminating against them on the basis of their gender.

215.    Plaintiffs and Class members were (i) subjected to verbal and physical conduct of a sexual nature, (ii) the conduct was unwelcome, and (iii) the conduct was sufficiently severe or pervasive to alter the conditions of the Plaintiffs' and Class members' employment and create an abusive work environment that a reasonable person in their position would perceive as an abusive environment in violation of the NYCHRL.

216.     As set forth above, Defendants were aware of the discriminatory conduct but failed to exercise reasonable diligence to prevent such discrimination and harassment against Plaintiffs and Class members.

217.     Through Defendant Johnny Utah's owners and supervisors, including Defendants Sullivan, Casabona and Lozado, Defendants participated in the discrimination and also ratified the unwelcome sexual misconduct by male customers.

218.     Defendants retaliated against those Plaintiffs and Class members who objected to or refused to allow male customers to engage in sexually discriminatory conduct.

219.     Plaintiffs and Class members were subjected to constant and pervasive sexual harassment including unwelcome verbal and physical sexual advances. Defendants forced Plaintiffs and Class members to tolerate a hostile work environment in which they personally endured repeated sexual harassment and physical contact.

220.     Defendants acts and conduct, individually and jointly, were intentional and malicious and in complete disregard for the rights of Plaintiffs and Class members.

221.     As a direct and proximate cause of Defendants' conduct, Plaintiffs and Class members have suffered and continue to suffer damages.

222.     The aforementioned acts of Defendants constitute unlawful discrimination and pursuant to § 8-502, Defendants are liable for damages, including punitive damages and attorney's fees.

**COUNT II
DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
IN VIOLATION OF THE NYSHRL
(On behalf of the Female Service Employee Class)**

223.     Plaintiffs hereby repeat and reallege all allegations as if fully set forth herein.

224.     Defendant Johnny Utah's is an "employer" as defined in the NYSHRL.

42

225.   Plaintiffs and Class members are "employees" as defined in the NYSHRL.

226.   Defendants Casabona and Lozado are "aiders" and "abettors" as defined in the NYSHRL.

227.   Section 296  of the NYSHRL makes it an unlawful discriminatory practice:

> For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

228.   Defendants violated the rights of the Plaintiffs and Class members under § 296 of the NYSHRL by discriminating against them on the basis of their gender.

229.   Plaintiffs and Class members were (i) subjected to verbal and physical conduct of a sexual nature, (ii) the conduct was unwelcome, and (iii) the conduct was sufficiently severe or pervasive to alter the conditions of the Plaintiffs' and Class members' employment and create an abusive work environment that a reasonable person in their position would perceive as an abusive environment in violation of the NYSHRL.

230.   As set forth above, Defendants were aware of the discriminatory conduct but failed to exercise reasonable diligence to prevent such discrimination and harassment against Plaintiffs and Class members.

231.   Through Defendant Johnny Utah's owners and supervisors, including Defendants Sullivan, Casabona and Lozado, Defendants participated in the discrimination and also ratified the unwelcome sexual misconduct by male customers.

232.   Defendants retaliated against those Plaintiffs and Class members who objected to or refused to allow male customers to engage in sexually discriminatory conduct.

233.     Plaintiffs and Class members were subjected to constant and pervasive sexual harassment including unwelcome verbal and physical sexual advances. Defendants forced Plaintiffs and Class members to tolerate a hostile work environment in which they personally endured repeated sexual harassment and physical contact.

234.     Defendants acts and conduct, individually and jointly, were intentional and malicious and in complete disregard for the rights of Plaintiffs and Class members.

235.     As a direct and proximate cause of Defendants' conduct, Plaintiffs and Class members have suffered and continue to suffer damages.

236.     The aforementioned acts of Defendants constitute unlawful discrimination and pursuant to § 297(9) Defendants are liable for damages and such other remedies as may be deemed just and appropriate.

## COUNT III
## THE FAIR LABOR STANDARDS ACT
## OVERTIME WAGE COMPENSATION
### (On behalf of the Collective Action Class)

237.     Plaintiffs hereby repeat and reallege all allegations as if fully set forth herein.

238.     Defendants were and continue to be employers engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. § 203.

239.     At all relevant times, Defendants had gross annual revenues in excess of $500,000.

240.     Plaintiffs and Class members are employees within the meaning of the FLSA, 29 U.S.C. § 203(e).

241.     In violation of 29 U.S.C. §207, the Defendants had a policy and practice of failing to pay Plaintiffs and Class members their earned overtime wages, at the rate of one and one half times the regular rate of pay, for all time in which they worked in excess of forty (40) hours in any given week.

242.    Defendants knew of or showed a willful disregard for the provisions of the FLSA as evidenced by their failure to compensate Plaintiffs and Class members at the statutory rate of time and one-half for their hours worked in excess of forty (40) hours per week when Defendants knew or should have known such was due.

243.    Due to the intentional, willful and unlawful acts of Defendants, Plaintiffs and Class members suffered damages in an amount not presently ascertainable of unpaid overtime wages, plus an equal amount as liquidated damages.

244.    Plaintiffs have consented in writing to be a party to this action, pursuant to 29 U.S.C. §216(b).

245.    Plaintiffs and Class members are entitled to an award of reasonable attorneys' fees and costs pursuant to 29 U.S.C. §216(b).

### COUNT IV
### THE FAIR LABOR STANDARDS ACT
### MINIMUM WAGE COMPENSATION
### (On behalf of the Collective Action Class)

246.    Plaintiffs hereby repeat and reallege all allegations as if fully set forth herein.

247.    In violation of 29 U.S.C. § 206, the Defendants had a policy and practice of refusing to pay the statutory minimum wage to Plaintiffs and Class members for their hours worked.

248.    At all relevant times, Defendants knew of or showed a willful disregard for the provisions of the FLSA.

249.    Due to the intentional, willful and unlawful acts of Defendants, Plaintiffs and Class members suffered damages in an amount not presently ascertainable of unpaid minimum wages, plus an equal amount as liquidated damages.

250.    Plaintiffs and Class members are entitled to an award of reasonable attorneys' fees and costs pursuant to 29 U.S.C. §216(b).

**COUNT V**
**VIOLATION OF THE NEW YORK LABOR LAW**
**OVERTIME WAGE COMPENSATION AND SPREAD OF HOURS**
**(On behalf of the NYLL Class)**

251.     Plaintiffs hereby repeat and reallege all allegations as if fully set forth herein.

252.     At all relevant times, Plaintiffs and Class members have been employees of Defendants, and Defendants have been employers of Plaintiffs and the Class members within the meaning of the NYLL §§ 190, 650 *et seq*., and the supporting NYCRR.

253.     At all relevant times, the overtime wage and spread of hours provisions of Article 19 of the NYLL and its supporting regulations apply to Defendants, and protect Plaintiffs and the Class members of the Rule 23 Class, including but not limited to the regulations in 12 NYCRR Part 137, in force until January 1, 2011 and Part 146, which superseded Part 137, effective January 1, 2011 (hereinafter "Part 146").

254.     Upon information and belief, Plaintiffs and Class members regularly worked more than forty (40) hours a week for Defendants.

255.     Section 146-1.4, states that "[a]n employer shall pay an employee for overtime at a wage rate of 1/12 times the employee's regular rate for hours worked in excess of 40 hours in one workweek."

256.     Defendants willfully violated Plaintiffs' and Class members' rights by failing to pay overtime compensation they are entitled to receive under the NYLL and the supporting NYCRR.

257.     Upon information and belief, Plaintiffs and Class members regularly worked more than ten (10) hours in a workday.

258.     Section 146-1.6(a), states that "[o]n each day on which the spread of hours exceeds 10, an employee shall receive one additional hour of pay at the basic minimum hourly rate."

259.    Defendants have willfully failed to pay Plaintiffs and Class members additional compensation of one hour's pay at the basic minimum hourly wage rate for each day during which they worked more than 10 hours, as required by New York law.

260.    Through Defendants' knowing or intentional failure to pay Plaintiffs and Class members overtime wages for hours worked in excess of 40 hours per week and their failure to pay Plaintiff and the Class members spread-of-hours pay, Defendants have willfully violated the NYLL.

261.    Due to Defendants' violations of the NYLL, Plaintiffs and the Class members are entitled to recover from Defendants their unpaid overtime wages, liquidated damages, as provided for by the NYLL, reasonable attorneys' fees, costs, and pre judgment and post judgment interest.

**COUNT VI**
**VIOLATION OF THE NEW YORK LABOR LAW**
**MINIMUM WAGE COMPENSATION**
**(On behalf of the NYLL Class)**

262.    Plaintiffs hereby repeat and reallege all allegations as if fully set forth herein.

263.    The minimum wage provisions of Article 19 of the NYLL and the supporting NYCRR apply to Defendants, and protect Plaintiffs and Class members.

264.    Pursuant to the NYLL, Defendants were required to pay Plaintiffs and Class members a minimum wage at a rate of (a) $7.15 per hour for all hours worked from January 1, 2007 through July 23, 2009; (b) $7.25 per hour for all hours worked from July 24, 2009 through December 31, 2013, and (c) $8.00 per hour for all hours worked from December 31, 2013, through the present.

265.    Pursuant to § 146-1.3, Defendants were entitled to take a tip credit towards the basic minimum hourly rate as follows: (a) on and after January 1, 2011, service employees must receive a wage of at least $5.65 per hour, and credit for tips shall not exceed $1.60 per hour, provided that

the total of tips received plus wages equals or exceeds $7.25 per hour; and (b) on and after December 31, 2013, service employees must receive a wage of at least $5.65 per hour, and credit for tips shall not exceed $2.35 per hour, provided that the total of tips received plus wages equals or exceeds $8.00 per hour.

266.    Through their knowing or intentional failure to pay minimum hourly wages to Plaintiff and the Class members, Defendants have willfully violated the NYLL and the supporting NYCRR.

267.    Due to Defendants' violations of the NYLL, Plaintiffs and the Class members are entitled to recover from Defendants their unpaid minimum wages, liquidated damages, as provided for by the NYLL, reasonable attorneys' fees, costs, and pre judgment and post judgment interest.

**COUNT VII**
**VIOLATION OF NYLL SECTION 196-d**
**(On behalf of the NYLL Class)**

268.    Plaintiffs hereby repeat and reallege all allegations as if fully set forth herein.

269.    Gratuities provided by Defendants' customers to Plaintiffs and Class members constitute "wages" as that term is defined under Article 6 of the NYLL.

270.    Pursuant to Article 6, NYLL §196-d, "[n]o employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee."

271.    Defendants required Plaintiffs and Class members to contribute all gratuities from shifts to the collective "tip pool."

272.    At all relevant times, Defendants continuously failed to disclose to Plaintiffs and Class members: (1) the total daily and weekly amounts placed into the tip pool; (2) each employee's

percentage of said tip pool; and (3) the total amounts of tip pool distributions. Further, Defendants intentionally and knowingly failed to disclose to Plaintiff and Class members a list of participating members of the "tip pool" and any procedures or policies in place governing the distribution.

273.    Upon information and belief, Defendants or Defendants' agent(s) or officer(s) or other persons not entitled to participate in the tip pool shared directly or indirectly with the tips earned by Plaintiffs and Class members.

274.    Upon information and belief, Defendants intentionally or recklessly permitted individuals with managerial authority and ownership interests to share in the employee tip pool and retained charges purported to be a gratuity for an employee.

275.    Upon information and belief, Defendants recklessly and arbitrarily distributed contributions to the tip pool to Plaintiffs and Class members.

276.    Pursuant to NYLL, Plaintiffs and Class members are entitled to recover from Defendants their unpaid minimum wages, liquidated damages, pre judgment and post judgment interest, reasonable attorneys' fees, and costs and disbursements of the action.

**WHEREFORE**, Plaintiffs, on behalf of themselves and members of the Class, respectfully pray for relief against Defendants as follows:

a.    An order permitting Plaintiffs to give notice of this collective action, or that this Court give such notice, at the earliest permissible time, to all persons who presently work at Defendant Johnny Utah's, and to all persons who have worked at said restaurant during the six (6) years immediately preceding the filing of this complaint as a server, hostess, bartender, Daisy Dukes girl, busser/runner or bar back. The notice shall inform them of the fact that this lawsuit has been filed, the nature of the claims and the right to join the lawsuit;

b.    An injunction against Defendants from engaging in each of the unlawful practices, policies and patterns set forth herein;

c.    An award of unpaid overtime compensation, minimum wages and liquidated damages pursuant to 29 U.S.C. §216, due under the FLSA;

      d.    An award of unpaid overtime compensation, minimum wages, unpaid "spread of hours" premium due and liquidated damages under the New York Labor Law, plus interest;

      e.    An award of unpaid wages due to misappropriation of tip pool monies due under the New York Labor Law;

      f.    Attorneys' fees and costs;

      g.    Designation of this action as a class action pursuant to Rule 23;

      h.    Designation of Plaintiffs as class representative; and

      i.    Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable as of right by jury.

Dated: June 17, 2014
      New York, New York

           Respectfully submitted,

           IMBESI CHRISTENSEN


           _____

           Jeanne Christensen (jc3991)
           450 Seventh Avenue, Suite 1408
           New York, New York 10123
           (212) 736-5588 (Phone)
           (212) 658-9177 (Fax)
           ***Attorneys for Plaintiffs***